

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

JONATHAN R. BURRS,

    Plaintiff,

v.

UNITED TECHNOLOGIES
CORPORATION, and

WALTER KIDDE PORTABLE
EQUIPMENT, INC.,

    Defendants.

CIVIL ACTION NO. 18CV491

COMPLAINT

JURY TRIAL DEMAND

## NATURE OF THE ACTION

This is an employment discrimination case brought pursuant to the provisions of the Civil Rights Act of 1866, 42 U.S.C §1981, as amended by the Civil Rights Act of 1991 ("Section 1981") to correct unlawful employment discrimination on the basis of race/color, sex, harassment, retaliation, intentional infliction of emotional distress, and hostile work environment leading to constructive discharge for the purposes of providing appropriate relief to Plaintiff Jonathan R. Burrs ("Mr. Burrs" or "Plaintiff") who was adversely affected by discrimination, retaliation, intentional infliction of emotional distress and hostile work environment from his employer, Walter Kidde Portable Equipment, Inc. ("Kidde" or "Defendant-Kidde"), which was sanctioned by Kidde's parent company United Technologies Corporation ("UTC" or "Defendant-UTC"). The hostile work environment Plaintiff endured as a result of the discrimination, harassment, retaliation and intentional infliction of emotional distress by

Defendant resulted in Plaintiff's physical suffering, lost wages, significant mental anguish, loss of property and ongoing medical treatment.

## JURISDICTION AND VENUE

1. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331.

2. This action is authorized and instituted pursuant to 42 U.S.C. §1981 - Equal rights under the law.

3. The majority of the discriminatory actions and retaliation commenced within the jurisdiction of the United States District Court for the Middle District of North Carolina.

4. Venue in this district is proper pursuant to 28 U.S.C. § 1391(b).

## PARTIES

5. Plaintiff, Jonathan R. Burrs, is a former employee of Defendant. Mr. Burrs resides at 118 Pangborn Boulevard, Hagerstown, MD 21740. As an employee of Defendant, Mr. Burrs regularly performed job duties at 1016 Corporate Park Drive, Mebane, NC 27302. Mr. Burrs is a 47-year-old, African-American male who suffers with a neurological condition demyelinating disease that can lead to Multiple Sclerosis (MS). Defendant was aware of this condition, having been provided with notice of said condition by Plaintiff during Plaintiff's employ. Both during and subsequent to his employment with Defendant, and as a result of the hostile work environment cultivated by Defendant, Plaintiff's pre-existing condition was significantly exacerbated.

### Defendant-UTC

6. UTC is an international corporation headquartered in Farmington, Connecticut. For the year 2017, UTC reported $59.8 billion in sales and $15.8 billion in profits.

7. Defendant-UTC serves customers in the commercial aerospace, defense and building industries and ranks among the world's most respected and innovative companies.

2

8. Defendant-UTC has more than 200,000 employees located at facilities across the world in one of four divisions: OTIS, UTC Climate Controls & Security, Pratt Whitney and UTC Aerospace Systems.

9. Defendant-UTC operates under a global business plan and the Achieving Competitive Excellence operating system, also known as ACE, that is established at its headquarters in Farmington, Connecticut, and similarly implemented in each of its division facilities throughout the world. The ACE system focuses on the drivers of competitive excellence and work processes.

10. Defendant-UTC is a publicly-traded Delaware corporation registered to conduct business in the State of Connecticut. Defendant-UTC's place of business in Connecticut is 10 Farm Springs Road, Farmington, CT 06032.

Defendant-Kidde

11. Walter Kidde Portable Equipment, Inc., Edwards Division; a Subsidiary of UTC Building and Industrial Systems, is a publicly-traded Delaware corporation registered to conduct business in the State of North Carolina. Defendant-Kidde's place of business in North Carolina is 1016 Corporate Park Drive, Mebane, NC 27302.

12. Between the dates of May 12, 2014, and November 2, 2015, Plaintiff was employed by Defendant-Kidde; the causes of action herein arose during this time period, and the alleged illegal conduct occurred not only within this timeframe but continues through the present.

FACTS RELATING TO THE PATTERN OF INTENTIONAL AND SYSTEMIC DISCRIMINATION, RETALIATION, HARASSMENT AND INFLICTION OF EMOTIONAL DISTRESS

13. Defendant-Kidde's employment practices discriminated against Plaintiff on the bases of his race and gender and reflect blatant retaliation for complaining about disparate treatment. The discriminatory and retaliatory practices engaged in by Defendant-Kidde were intentional and systemic in nature, and adversely affected Plaintiff with respect to a hostile-free work environment, hiring, and other terms and conditions of employment, as specifically enumerated below.

14. Plaintiff entered Defendant-Kidde's employ with more than twenty-four years of Information Systems industry experience in the software development and full lifecycle, systems analysis, technical project management and business analysis arenas. Plaintiff also served as a computer programmer with the Headquarters Recruiting Command for four years while on active duty in the United States Army before being honorably discharged and obtaining more than two decades of experience providing information systems services to private and publicly-traded companies.

15. Plaintiff was employed by Defendant-Kidde as a Senior Business Consultant/IT Business Consultant in Defendant-Kidde's Customer Service Department. On or about July 1, 2014, and for no apparent reason, Plaintiff's position title changed to Senior Analyst, Manufacturing Production. There was no change in Plaintiff's duties or responsibilities related to his position title change.

16. Shortly after his title change, Plaintiff discovered that he was being denied access by Defendant-Kidde's IT management team to development and analysis tools, as well as company-owned documentation. Plaintiff understood the aforementioned tools and documentation to be critical to his job performance.

17. Plaintiff contends that his unexplained title change was merely a pretext for the discrimination being perpetrated by Defendant-Kidde, as explained more fully below.

4

A. <u>Discrimination Based on Race and Gender; Denied Critical Tools Related to Job Performance</u>

18. On or about September 4, 2014, and September 8, 2014, respectively, Plaintiff requested access to the critical tools and documentation needed to perform his job. Both requests were denied, once by Karol Fritz and once by Lee Deskus, both members of Defendant-Kidde's IT Management team.

19. Plaintiff viewed this denial of access as disparate treatment by Karol Fritz, the prior analyst whose position Plaintiff now occupied. Ms. Fritz, a Caucasian female, recently had been transferred from her analyst position in Defendant-Kidde's Customer Service Department to its Information Technology Department, where she served as the manager of software development. Prior to being transferred to Defendant-Kidde's IT Department, Ms. Fritz had no other professional experience in the Information Systems industry.

20. During Ms. Fritz's service as an analyst for Defendant-Kidde, occupying the same position as Defendant, she had access to the critical tools and documentation to which Plaintiff was denied access.

B. <u>Retaliation Against Plaintiff for Complaining About Disparate Treatment</u>

21. On or about September 12, 2014, and for the first time, Plaintiff protested the disparate treatment he received in comparison to Ms. Fritz. In an e-mail to Mr. Deskus, a Caucasian male, Plaintiff provided evidence of the e-mail chain between himself and Ms. Fritz wherein Ms. Fritz was deceptive with Plaintiff regarding his access to the tools and documentation he needed. Plaintiff was clear in his e-mail to Mr. Deskus that he felt this disparate treatment was related to his race.

5

22. Mr. Deskus' immediate response to Plaintiff's complaint of disparate treatment was to retaliate and place unjustifiable blame on Plaintiff, falsely accusing him of being unable to get along with members of Mr. Deskus' staff.

23. Mr. Deskus' above-referenced statement would later be used against Plaintiff in Plaintiff's 2014 Employee Performance Review, performed by Ms. Suzanne Turner, a Caucasian female, who was not Plaintiff's immediate supervisor and with whom Plaintiff had no interaction or contact during the 2014 annual performance review period. Ms. Turner's actions were intentional and retaliatory based on Plaintiff's complaint of disparate treatment.

24. On or about October 12, 2014, approximately one month after Plaintiff informed Mr. Deskus of the disparate treatment between himself and Ms. Fritz, Ms. Fritz instigated an erroneous ethics investigation against Plaintiff, accusing him of "violating protocol." Plaintiff believed this unsupported investigation to be harassment and retaliation resulting from his complaint of disparate treatment to Mr. Deskus. The outcome of the investigation showed that Plaintiff, in fact, had not violated protocol.

25. On or about October 13, 2014, Plaintiff was summoned into an unscheduled meeting with Curtis Thornton, Defendant-Kidde's Human Resources (HR) Manager, and Ms. Fritz. During this meeting, which was held in Mr. Thornton's office, Plaintiff was ambushed, denigrated and screamed at by Ms. Fritz. Plaintiff was never given an opportunity to respond to any of the claims brought against him during the meeting and immediately felt an intense level of discomfort in the office. During this meeting, Mr. Thornton did nothing to mitigate Ms. Fritz's physical aggression toward Plaintiff.

26. On or about October 14, 2014, Plaintiff again reported the disparate treatment, retaliation, harassment and hostile work environment to Mr. Thornton, who personally had witnessed the hostility against Plaintiff the prior day. When Mr. Thornton asked Plaintiff

6

whether he felt that the disparate treatment was a result of race and gender discrimination, Plaintiff answered affirmatively, providing evidence of both Ms. Fritz's ability to provide the documentation and tools Plaintiff needed, as well as Ms. Fritz's refusal to do so.

27. At that same time, Plaintiff also shared concerns with Mr. Thornton about outstanding software application defects that were non-compliant with the Sarbanes-Oxley (SOX) Act, as well as Defendant's subsequent exposure to fraud by a temporary employee related to that non-compliance.

28. Plaintiff emphasized both the importance of resolving the software defects for quality purposes and Defendant-Kidde's reporting obligations under SOX related to same to the Securities and Exchange Commission (SEC). Defendant-Kidde not only failed to comply with the SEC reporting obligations regarding the fraud that had occurred, but also failed to disclose to the SEC that its product returns application, an application having a significant role in the accounting process, was not functioning as expected.

29. Mr. Thornton discussed Plaintiff's concerns with management and, based on Plaintiff's argument and evidence, Defendant-Kidde opened an investigation on the issue. Mr. Thornton provided periodic status updates of his investigative findings to Defendant-Kidde's management team.

30. On or about January 6, 2015, Plaintiff met with Defendant-Kidde's HR Director, Andrea Sirko-DeLancey, a Caucasian female, and Ms. Turner, who recently had been hired into a newly-created position as Senior Manager of Customer Service, to discuss some of the concerns Plaintiff had brought to the attention of Defendant-Kidde's management team through Mr. Thornton. Plaintiff was introduced to Ms. Turner for the first time at the meeting on January 6, 2015.

7

C. <u>Hostile Work Environment and Retaliation Against Plaintiff for Raising Racial Discrimination Concerns with Human Resources</u>

31. On or about January 16, 2015, Plaintiff was again the target of unprofessional and abusive/hostile treatment in the workplace. On the aforementioned date, Plaintiff attended a meeting with Ms. Sirko-DeLancey and Ms. Turner. During a discussion regarding Plaintiff's allegation of disparate treatment between himself and Ms. Fritz, Ms. DeLancey and Ms. Turner began verbally attacking Plaintiff, calling him a "poor communicator" and referring to him as "arrogant." Plaintiff's attempted responses to the accusations and verbal attacks were consistently interrupted by more attacks from Ms. DeLancey and Ms. Turner, so Plaintiff requested to be excused from the meeting.

32. Both during and after this meeting, Plaintiff's feeling of uneasiness transformed into chronic anxiety. Plaintiff began to succumb to anxiety and panic attacks, which made it impossible for him to continue working on January 16, 2015. As a result, he took four hours of sick leave for the rest of the day.

33. Plaintiff also began experiencing unwarranted scrutiny from Mr. Thornton regarding his attendance at work, which never had been an issue before his complaints of discrimination in the workplace and SOX violations. Neither Mr. Thornton nor Theresa Farrell (Plaintiff's immediate supervisor) had taken issue with Plaintiff's attendance record prior to that time. Mr. Thornton sent Plaintiff a warning regarding the four hours of sick leave Plaintiff took after his traumatic meeting with Ms. DeLancey and Ms. Turner.

34. On January 26, 2016, during a meeting regarding Plaintiff's early departure for the sake of his wellness on January 16, 2015, Plaintiff informed both Mr. Thornton and Ms. Farrell of his medical history of anxiety and panic attacks that were triggered by the meeting with Ms. DeLancey and Ms. Turner.

8

35. On or about January 27, 2015, Mr. Thornton reduced to writing his complaint about Plaintiff's attendance regarding Plaintiff's late arrival to work on January 26, 2015, after inclement weather slowed Plaintiff's commute from his home in Hagerstown, Maryland, some 320 miles away. Plaintiff had been living in Hagerstown, Maryland since he began working for Defendant, and it was not unlikely or unreasonable that Plaintiff's commute would be affected by the inclement weather in the state of Maryland in January 2015.

36. On or about January 28, 2015, Plaintiff sent an e-mail to Ms. Farrell; James Ward, a Caucasian male and Defendant-UTC's Division President; and Bob McDonough, a Caucasian male and Defendant-UTC's Chief Operating Officer, regarding a neurological illness/demyelinating disease he had been diagnosed with in 2006.

37. The January 28, 2015, email to Mr. Ward and Mr. McDonough depicted a work environment of significant hostility towards Plaintiff, including an incident described as a "…Gestapo style ambush and interrogation meeting with Curtis and Karol Fritz the day after being falsely accused of an ethics violation." The correspondence expressed Plaintiff's belief that he was a target of harassment by a clique of managers.[1]

38. Defendant-UTC's ACE operating system affords employees the opportunity to escalate issues to the highest level in the organization, as employees deem necessary, to achieve resolution without fear of retribution or reprisal.

39. Mr. Ward and Mr. McDonough, both Defendant-UTC executives in the immediate chain of command of the managers harassing and retaliating against Plaintiff, made no attempts at any point to resolve the hostile work environment, effectively sanctioning it.

---

[1] January 28, 2015 correspondence from Jonathan Burrs to James Ward (UTC Division President) and Bob McDonough (UTC Chief Operating Officer) – "I feel there is a concerted effort by a [sic] two or three Kidde resources in key positions to manufacture and influence false perceptions of me to fit a narrative depicting me as a problem employee."

9

40. As Plaintiff began to understand the extent of the hostile environment he faced with Defendants, his health began to suffer greatly. Plaintiff's decline in health required significant attention, so between January 28 and January 30, 2015, Plaintiff took sick leave to attend physician appointments.

D. <u>Retaliation and Hostile Work Environment Based on Race and Gender</u>

41. Defendant-UTC uses an online application to maintain employee information, including performance evaluations, which functionality limits employee performance evaluations to input from the employee, his/her immediate supervisor, and anyone the employee invites to participate in the evaluation.

42. At no point during Plaintiff's employment with Defendant-Kidde was Ms. Turner Plaintiff's immediate supervisor, nor did Plaintiff invite Ms. Turner to participate in his 2014 employee performance evaluation.

43. In February 2015, Plaintiff received a negative performance review by Ms. Turner. Ms. Turner's written assessment of Plaintiff's 2014 job performance colored the negative aspects of the review. Plaintiff found Ms. Turner's participation in that evaluation particularly alarming since he and Ms. Turner had never met before January 6, 2015. Despite Ms. Turner having no basis upon which to evaluate Plaintiff's 2014 job performance, her discriminatory assessment was included in the review, along with unsupported false information.

44. In February 2015, Plaintiff learned that Ms. Turner had received authorization from Ms. Sirko-DeLancey to have Ms. Turner's assessment of Plaintiff's performance inserted into his 2014 annual employee performance evaluation. Ms. Delancey's authorization circumvented the functionality of the employee performance evaluation tool used by Defendant-UTC, which was designed to prevent such behaviors.

10

45. Plaintiff was discriminated and retaliated against by being denied the same rights as Defendants' Caucasian employees, who had only their immediate supervisors and employee-invited guests to provide their performance evaluations.

46. On or about February 27, 2015, Plaintiff also provided rebuttals to Ms. Turner's comments in his 2014 performance review, indicating that they constituted unlawful retaliation. In the performance review, Ms. Turner accused Plaintiff of often fleeing from situations; in his rebuttal, Plaintiff indicated that he had only asked to be excused from two meetings when he experienced anxiety attacks that were triggered by particularly abusive conduct by Defendant-Kidde's agents. Plaintiff had made his health struggles well known to his superiors and found it inappropriate that those same struggles would be used against him in a performance review.

47. Of Defendant-UTC's 200,000+ global employees, Plaintiff was the only one to have his performance review targeted with disparaging assessments by someone with whom he had no contact or interaction during the relevant review period.

48. Ms. Turner's assessment that Plaintiff had shown signs of being unable to get along with staff in Defendant-Kidde's IT department was based solely on Mr. Deskus' retaliatory email of September 12, 2014, falsely accusing Plaintiff of same.

49. These facts are evidence that Plaintiff's professional reputation was damaged by Mr. Deskus' comments.

50. Plaintiff believes that Ms. Turner's assessment of his performance in 2014, a timeframe when he and Turner had no interaction either personally or professionally, is directly related to Plaintiff's complaint of disparate treatment to Mr. Deskus and Defendant-Kidde's HR department. Turner's assessment was retaliatory under the law and further violated the strict non-retaliatory policy Defendant-UTC guaranteed to all its employees.

11

51. In March 2015, Plaintiff applied for the IT Leader position with Defendant-Kidde a position for which he was uniquely and well qualified.

52. In March 2015, April Stephanie Murphy, Defendant-UTC's Regional Ethics Director, launched an investigation regarding Plaintiff's complaints. During her investigation, Ms. Murphy suggested that Plaintiff may have been a threat to his superiors during "tough situations" related to his disorder. Plaintiff felt personally attacked and explained to Ms. Murphy that he did not have a medical condition like Post-Traumatic Stress Disorder that could cause him to snap, but that instead, as he had made clear to management on various occasions, he struggled with anxiety and demyelinating disease, a neurological disorder that could lead to MS, neither of which made him a violent threat. Plaintiff added that he would do exactly as he had twice before, asking to be excused from the hostile situation.

53. On April 1, 2015, Ms. Turner assigned Plaintiff to the JD Edwards (JDE) project team as the User Acceptance Test Leader for Customer Care.

54. Plaintiff was immediately suspicious of Ms. Turner assigning him to the JDE project, especially after being rejected when he volunteered for the project in 2014, when Ms. Turner served as the project manager.

55. Shortly after being assigned to the JDE project, Plaintiff spoke with his immediate supervisor, expressing in no uncertain terms that he did not trust Ms. Turner's motives. Plaintiff contended that the assignment to the project appeared to be a setup, so Ms. Turner could blame him for anything that might possibly go wrong, having heard that the project was failing already.

56. Plaintiff later would document the current state of the project's testing approach, compare that approach to industry standards for software testing and best practices and provide recommendations for improvements. Plaintiff developed the documentation primarily to protect himself against potential poor performance accusations he feared Ms. Turner would make

12

against him under the guise of a non-discriminatory, non-retaliatory business action, based on Ms. Turner's prior behavior.

E.  Discrimination Against African Americans in Hiring to Information Technology Department Management Positions

57. Defendant-Kidde practiced a policy that did not consider or hire African Americans as managers in its IT Department.

58. Defendant-Kidde practiced a policy that did not consider or hire African Americans in its IT Department.

59. Defendant-UTC does not have uniform practices or objective standards or criteria for making hiring decisions for IT positions in its Business Industrial Systems division. Defendant-UTC managers are free to make those employment decisions based on their own subjective preferences rather than objective criteria and individual qualifications. Because of these practices, African Americans are discriminated against in the hiring of individuals for Defendants' IT positions.

60. In April 2015, Plaintiff learned that HR refused to consider him for the IT Leader position, despite Plaintiff having demonstrated IT proficiencies that far exceeded those of the previous IT managers, Mr. Deskus and Ms. Fritz (again, both Caucasian). Said proficiencies could have translated into tens of millions of dollars in cost savings and waste reduction for Defendants.

61. Plaintiff was uniquely qualified for the IT Leader position, but was never even interviewed, despite both meeting all the qualifications for the position and specializing in the primary platforms to be used by the IT Leader.

62. Plaintiff would later learn that the individual who received the position was a Caucasian male who was far less qualified and experienced than Plaintiff. Defendant-Kidde never provided

Plaintiff with a reason why his application for the IT Leader position failed to advance in any way.

F. <u>Defendant Sanctioned Systemic Retaliation and Ongoing Hostile Work Environment Based on Race/Color and Gender</u>

63. On or about April 21, 2015, Ms. Murphy provided conclusions to her "investigation" of Plaintiff's complaints. Plaintiff realized that Defendants' zero-tolerance policy against retaliation would not be enforced when Defendants purported that Ms. Turner's comments on Plaintiff's 2014 performance evaluation were made in "good faith and found to be valid," falsely contending that Ms. Turner and Plaintiff had worked on the JDE project together in 2014, giving Ms. Turner the opportunity to personally evaluate Plaintiff's performance in 2014.

64. Ms. Murphy later would commit perjury in an affidavit dated November 27, 2017, attesting that Ms. Turner and Plaintiff had worked on the JDE project together in 2014. However, Defendant-UTC's own documentation on the JDE project, as well as emails between Ms. Turner and Plaintiff in 2015 and Plaintiff's own testimony unambiguously negated Ms. Murphy's affidavit testimony.

65. Defendant-Kidde discriminates and retaliates against the Plaintiff based on race/color and gender when Ms. Murphy, Ms. Sirko-Delancy, Ms. Turner, and Ms. Fritz all white females, use their management status to deny the Plaintiff the same rights as white employees by sanctioning a hostile work environment.

66. The Defendant's actions were systemic discrimination and retaliation attested to by Mr. Thornton's affidavit of November 1, 2017.[2]

---

[2] Curtis Thornton Affidavit of November 1, 2017 – "…Jonathan was the only one who took a stand against what he believed to be discrimination."

14

G.  Intentional and Negligent Infliction of Emotional Distress Leading to Constructive Discharge

67. On August 18, 2015, after reviewing the duplicate orders report and collaborating with multiple resources in Defendant-Kidde's IT department as well as resources in the business, it was collectively determined that the duplicate orders defect in the XPO systems would exponentially impact the JDE project once implemented in a production environment.

68. Plaintiff sent an email to all the key stakeholders involved in the JDE project informing them of those findings.

69. Plaintiff then met separately with Mr. Scott Little and Mr. Keith Kubera, both senior managers for Defendant-Kidde and key stakeholders on the JDE project. Mr. Kubera was the less-qualified candidate selected for the IT Leader position for which Plaintiff applied but was never considered or interviewed.

70. During the meeting with Mr. Kubera, Plaintiff learned of Mr. Kubera's professional background, experiences and education and was able to ascertain that Defendant had selected a candidate for the IT Leader position with significantly fewer qualifications than Plaintiff.

71. On August 19, 2015, Plaintiff was publicly attacked and berated by Ms. Turner in an e-mail that also was sent to the division President. Plaintiff made an analysis regarding a defect in the JDE system utilized by Defendant-Kidde, to which Ms. Turner responded with intense criticism, referencing Plaintiff's 2014 performance review. After Plaintiff fully supported his position in a responsive e-mail, Ms. Turner excoriated him again, berating him to every recipient on the e-mail chain.

72. After the attack Plaintiff suffered from Ms. Turner, Plaintiff immediately began experiencing significant physical/medical complications. On August 20, 2015, the very next day, Plaintiff began having acute anxiety episodes and was forced to seek treatment at the

15

Veterans Affairs Medical Center Emergency Room in Durham, NC, resulting in Plaintiff being place on medication for his symptoms.

73. Because of his feeble medical condition, Plaintiff was unable to return to Defendant-Kidde's hostile environment; Plaintiff took sick leave beginning August 20, 2015.

74. On August 25, 2015, while Plaintiff was still out on sick leave, Ms. Turner called Plaintiff's cell phone harassing him about when he was going to return to work. Ms. Turner's phone call further exacerbated Plaintiff's medical condition, triggering additional anxiety attacks and worsening the MS symptoms Plaintiff had been experiencing since the discrimination and retaliation by Defendant-Kidde began.

75. Ms. Turner's aggressive and harsh responses to Plaintiff performing standard project management functions in communicating with key stakeholders were both deliberate and malicious.

76. Plaintiff returned to the VA Medical Center emergency room in Durham, NC for treatment, at which time Plaintiff was diagnosed with acute anxiety episodes and placed on a second medication for the condition.

77. In September 2015, Plaintiff returned to Maryland for a battery of medical treatments through primary care at the VA Medical Center in Martinsburg, WV, including another brain MRI for his neurological condition.

78. The VA eventually prescribed a third medication to offset a condition known as Anorgasmia or Coughlan's Syndrome, which Plaintiff began experiencing as an adverse effect from one of the other medications the VA had prescribed.

79. As he continued to prioritize his health in an effort to return to work, Plaintiff was advised by his physicians and medical providers that returning to work for Defendant-Kidde would put his recovering health in jeopardy once again.

16

80. Since employment with Defendant-Kidde was no longer a possibility, Plaintiff submitted an involuntary resignation from his position with Defendant-Kidde, noting as the cause the emotional, physical and psychological complications he experienced because of the discrimination, intentional harassment and intentional retaliation he faced while employed with Defendant-Kidde.

PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully requests that this Court:

A. Find that Plaintiff was subjected to disparate treatment in the workplace when he was not given access to critical documentation and tools that were essential to his job performance.

B. Find that Defendant subjected Plaintiff to adverse actions when:

   a. Plaintiff was treated abusively and harassed in various meetings and e-mails as outlined above;

   b. Plaintiff was subjected to erroneous scrutiny regarding his attendance;

   c. Plaintiff received a negative performance review from an employee who had no basis to evaluate his 2014 job performance and who was not invited by Plaintiff to participate in the review; and

   d. Plaintiff was subjected to denial of opportunity to interview for and non-selection into a position for which he was more than qualified and passed over in favor of a less-qualified, Caucasian male.

C. Find that Plaintiff was the target of various unfavorable personnel actions and/or a retaliatory hostile environment leading to constructive discharge.

D. Find that Plaintiff's race/color, gender and complaints of disparate treatment were contributing factors to the unfavorable personnel actions to which Defendant-Kidde subjected him.

17

E.  Grant judgment to Plaintiff in the amount of $10,000,000.00 in compensatory damages and backpay, with pre- and post-judgment interest, and the same amount in liquidated damages for the medical costs Plaintiff incurred for the immeasurable emotional distress and irreparable damages caused by Defendants both during Plaintiff's employment with Defendant-Kidde and through the present.

F.  Grant judgment to Plaintiff in the amount of $1,000,000,000.00 for punitive damages, with pre- and post-judgment interest to adequately punish and deter future discriminatory and intentional retaliatory behavior and for fostering a hostile work environment by Defendants.

G.  Grant such further relief as the court deems necessary and proper in the public interest.

H.  Grant Plaintiff any costs of this action, including reasonable attorney fees, expert witness fees, and litigation costs.

## JURY TRIAL DEMAND

Plaintiff requests a jury trial on all questions of fact raised in the Complaint.

## CERTIFICATION

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a non-frivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

I agree to provide the Clerk's Office with any changes to my address where case-related papers

18

Case 1:18-cv-00491-CCE-LPA   Document 1   Filed 06/08/18   Page 18 of 19

may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Dated: June 6, 2018

Respectfully submitted,

*Jonathan R. Burrs*

Jonathan R. Burrs
118 Pangborn Blvd.
Hagerstown, MD 21740
301.491.7677
Jburrs1715@aol.com